UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

MUNSON HARDISTY, LLC,    )
    )
       Plaintiff,    )
    )
v.    )    No.:   3:15-cv-547-TAV-DCP
    )
LEGACY POINTE APARTMENTS, LLC,    )
    )
       Defendant.    )

## MEMORANDUM OPINION

This civil action is before the Court on defendant's Motion for Judgment on the Pleadings [Doc. 109]. Defendant filed this motion on April 3, 2018, and plaintiff responded on April 25, 2018 [Doc. 111]. Defendant replied on May 1, 2018 [Doc. 113]. For the reasons set forth below, the Court will **DENY** defendant's motion.

I.    **Procedural and Factual Background**

A.    **Summary of Allegations in Plaintiff's Complaint**

This civil action arises out of the construction of Legacy Pointe Apartments ("the Project"), an apartment complex in Knox County, Tennessee [Doc. 86 p. 2]. Defendant is a Tennessee limited liability company formed to construct the Project [*Id.*]. Plaintiff was one of four partners who undertook this business venture and served as general contractor on the Project, while defendant held title to the Project's real property and entered into financing covenants with the U.S. Department of Housing and Urban Development ("HUD") and HUD lenders [*Id.*]. The Project was financed through a loan offered and insured by HUD and underwritten by Wells Fargo ("Lender") pursuant to the HUD

§ 221(d)(4) program authorized by the National Housing Act [*Id.* p. 5]. 12 U.S.C. § 1715l(d)(3) and (d)(4) (2011). Under section 221(d)(4), defendant and each investor in defendant were bound to certain financing requirements, one of which provided that defendant and its investors could not enter into private secondary financing for the Project or receive any distributions during the term of the construction financing [*Id.*].

### 1.     The Construction Contract

On September 13, 2007, the parties entered into a cost-plus construction contract for the Project ("the Construction Contract"), which provided that plaintiff would be paid the actual cost of the Project's construction and would additionally receive an equity interest in the Project in lieu of a monetary fee [*Id.*]. Specifically, plaintiff received a ten-percent ownership interest in defendant, which is referred to in the contract as "BSPRA," a HUD acronym for Builder's and Sponsor's Profit and Risk Allowance [*Id.*].

The Construction Contract required plaintiff to furnish defendant with payment and performance bonds ("Payment and Performance Bonds") issued by the Great American Insurance Company ("GAIC") to assure completion of the work as specified in the Drawing and Specifications of the Project [*Id.*]. Any changes to the Drawing and Specifications had to be approved in writing by Lender and the HUD Commissioner, and defendant had a duty to initiate and approve change orders in good faith for all work it requested of plaintiff outside of the scope of the Drawings and Specifications [*Id.* at 7]. On September 4, 2007, the parties, GAIC, and others entered into an Indemnity Agreement related to the Payment and Performance Bonds and on September 13, 2007, the same day

that the parties entered into the Construction Contract, plaintiff obtained the Payment and Performance Bonds from GAIC in the amount of $18,047,049 [*Id.*].

Also on September 13, 2007, the HUD loan closed, and construction on the Project commenced [*Id.* at 6]. Defendant executed a Mortgagor's Certificate, which provided "upon completion of the Project there will not be outstanding any unpaid obligations contracted in connection with the purchase of the property, construction of the Project or the mortgage transaction except that such obligations may be approved by [HUD] as to term, form, and amount" [*Id.*].

Plaintiff alleges that, during the course of construction, defendant unilaterally modified the Drawings and Specifications for the Project in violation of the parties' previous agreement and that these changes created significant extra work for plaintiff that was outside the scope of the Construction Contract [*Id.* at 7]. Plaintiff also alleges that defendant did not submit these changes for approval to HUD and Lender and did not submit change orders [*Id.*]. Plaintiff alleges that, because of these changes, it performed work in excess of the contract amount by approximately $2,120,537.85 and that this amount remained outstanding to subcontractors, vendors, and suppliers (the "Claims for Extra Work") [*Id.*].

Under the Construction Contract defendant was obligated to pay plaintiff for all amounts incurred in connection with the Project, and plaintiff in turn was to pay subcontractors for any work performed [*Id.* at 7–8]. Prior to the closing of permanent financing for the project, on January 11, 2009, an outside certified public accountant

reviewed financial statements in connection with defendant's final cost certification to HUD [*Id.* at 8]. The auditor advised defendant that the extra amounts expended by defendant above and beyond the Construction Contract "are reconciled to the balance sheet and could represent a distribution and will have to wait for surplus cash later" [*Id.*]. Plaintiff alleges that defendant did not inform plaintiff of the auditor's red flag and was in fact told by defendant that it should not discuss cost certification with the auditor [*Id.*].

Later that month, plaintiff alleges, defendant promised to pay the outstanding Claims for Extra Work, totaling $2,120,537.85, to the respective subcontractors, vendors, and suppliers directly if plaintiff waived its right to receive payment for all amounts owed under the Construction Contract. Plaintiff was told that defendant intended to borrow funds from defendant's manager and majority member, Harold Moore, to pay the Claims for Extra Work directly, and thereby discharge plaintiff's liability for payment both to the subcontractors and on the Project's Payment and Performance Bonds [*Id.*]. Plaintiff alleges that it relied on this representation and waived its right to receive the payment ("the 2009 Agreement"). This agreement was allegedly memorialized in February 2009, when defendant promised plaintiff and represented to HUD and the Lender in writing that the funds defendant borrowed from its manager and majority member would be used to pay the Claims for Extra Work and defendant would repay this loan with its surplus cash [*Id.*].

Plaintiff alleges that at this time, unbeknown to plaintiff, defendant took the funds it borrowed from its managing member and fraudulently transferred them to a shill entity, State Insulation, LLC ("Defendant Affiliate") for no consideration [*Id.* at 2]. Defendant

Affiliate then took assignment of the subcontractor claims but did not discharge those claims as promised to plaintiff [*Id.*].  Instead, plaintiff alleges that defendant and Defendant Affiliate colluded in asserting the subcontractor claims Defendant Affiliate had obtained by assignment against the Payment Bond.

### 2.      Permanent Financing

On July 31, 2009, the Project auditor submitted a development cost audit for the Project to defendant.  The audit represented that defendant owed plaintiff $3,585,516 as "Construction Payable," which represented the BSPRA and the Claims for Extra Work [*Id.* at 9].  Plaintiff states that it did not demand this payment because the BSPRA amount had been contributed as "sweat equity" in order to receive a 10 percent membership interest in defendant, and plaintiff was relying on the 2009 Agreement for defendant to directly pay the subcontractors the Claims for Extra Work and thereby discharge plaintiff's liability [*Id.*].

In 2010, defendant secured a thirty-year loan offered and insured by HUD pursuant to HUD's § 221(d)(4) program [*Id.* at 3].  To secure this loan, defendant had to make certain representations to HUD and Lender, including that all claims resulting from the construction of the Project had been paid [*Id.*].  Defendant did so, making representations that all claims had been paid, excepting approximately $500,000, which defendant represented would be paid through escrow within forty-five days, and that there were no outstanding debts to subcontractors, vendors, and suppliers [*Id.* at 7].  Plaintiff alleges that defendant made this statement knowing that it was false, that those debts had in fact been

improperly assigned to Defendant Affiliate, and that Defendant Affiliate was preparing to make a fraudulent claim against the Payment Bond on behalf of those amounts [*Id.*]. Plaintiff protested defendant's representation to HUD and the Lender and refused to join defendant's statement [*Id.*].

### 3.   Suit Against GAIC

On October 23, 2009, Defendant Affiliate filed a complaint against GAIC, the insurer of the Payment Bond, in the Chancery Court for Knox County, Tennessee, making a claim against the Payment Bond plaintiff had provided for the Project [*Id.*]. Defendant Affiliate asserted that plaintiff had failed to pay the Claims for Extra Work and asked for $2,120,537.85 in addition to costs, prejudgment interest, and attorneys' fees (the "Bond Claim Action") [*Id.* at 11]. Plaintiff alleges that defendant knew of this suit but did not disclose its existence to HUD or the Lender [*Id.*]. On September 30, 2011, GAIC filed an interpleader complaint ("Interpleader Action") in the Chancery Court for Knox County, Tennessee pursuant to a settlement agreement it reached with Defendant Affiliate and defendant, and sought to deposit to the court $750,000 of funds it held as security for the Payment Bond [*Id.*]. On December 20, 2011, defendant and Defendant Affiliate filed an answer to GAIC's complaint and asserted a counterclaim against GAIC and a cross-claim against plaintiff, among others, in the Interpleader Action, arguing that Defendant Affiliate was entitled to the deposit, plus interest [*Id.*]. On June 6, 2012, Defendant Affiliate and GAIC dismissed the Bond Claim Action without prejudice. Plaintiff notes that on November 23, 2013, defendant's managing member represented in a declaration filed in

an action pending in the United States District Court for the Southern District of California, that the claims of the subcontractors in the Project, in the amount of approximately $2.1 million, had been paid. [*Id.* at 12].

### 4.    Refinancing of the Thirty-Year Loan

In 2012, defendant refinanced its thirty-year loan under HUD's § 221 program with a new HUD lender, Greystone Financial (the "New Lender") [*Id.*].   As part of this refinancing, defendant executed a Regulatory Agreement, certifying again that defendant had no unpaid obligations with respect to the mortgaged property and that all contractual obligations of defendant or on behalf of the defendant were fully disclosed to HUD [*Id.*].

At or around the time of the closing of this refinancing, defendant executed a Surplus Cash Note to its member manager Harold Moore in the amount of $2,474,322 (the "Surplus Cash Note") [*Id.*].   Plaintiff alleges on information and belief that defendant obtained HUD's required consent for this Surplus Cash Note by falsely representing to HUD that the managing member had lent $2,120,537.85 to defendant to pay for the Claims for Extra Work, and would be repaid out of surplus cash from defendant [*Id.* at 12–13]. Plaintiff alleges that in reality the funds had been transferred to Defendant Affiliate for no consideration in order for Defendant Affiliate to purchase the Claims for Extra Work and pursue a claim against the Payment Bond [*Id.*].   Plaintiff alleges that this scheme would allow for an illegal triple recovery of the Claims for Extra Work: first from the proceeds of a false claim against the Payment Bond, second from the proceeds from the of repayment

of the Surplus Cash Note, and third by failing to pay defendant's original obligation to plaintiff for the Claims of Extra Work [*Id.* at 13].

At the close of the 2012 refinancing, defendant again needed to, and did, make representations to HUD under penalty of perjury in a Certificate that no unpaid obligations from the Project remained outstanding [*Id.*]. Plaintiff alleges that defendant made these representations again knowing them to be false and further without disclosing Defendant Affiliate's recently dismissed litigation against GAIC, the Interpleader Action which alleged the existence of outstanding unpaid obligations, the outstanding construction payable to plaintiff, and defendant's Surplus Cash Note [*Id.*]. Plaintiff states that it refused to provide its consent to this refinancing, believing it to be obtained under false pretenses and tainted by fraud, and advised defendant that seeking HUD refinancing under false pretenses was wrongful [*Id.* at 14].

### 5. Retaliation Against Plaintiff

Plaintiff alleges that defendant retaliated against it because it maintained that the refinancing was wrongful and stated that, as a ten-percent member of defendant, its consent should have been required [*Id.* at 15]. First, on or about April 2014, plaintiff alleges that defendant took actions to repudiate and eliminate plaintiff's ten-percent membership in defendant [*Id.*]. Second, plaintiff alleges that defendant filed a state-court action in Tennessee Circuit Court to divest plaintiff of its membership interest in defendant and to divest plaintiff of its economic rights to the BSPRA [*Id.*]. Third, plaintiff alleges that on January 17, 2014, defendant and Defendant Affiliate filed an amended counterclaim and

crossclaim in the Interpleader Action asserting therein a new claim of $2.1 million for damages against plaintiff for the Claim for Extra Work [*Id.* at 16]. In the amended claims, defendant and Defendant Affiliate alleged that plaintiff had failed to pay the Claims for Extra Work to Defendant Affiliate, which had been assigned these claims from the subcontractors. Plaintiff states that these Claims for Extra Work are the same Claims that defendant agreed in February of 2009 to pay directly to the subcontractors [*Id.*].

Plaintiff alleges that defendant and Defendant Affiliate's amended counterclaim and crossclaim revived plaintiff's right to original payment by defendant for Claims for Extra Work. Plaintiff asserts that any statute-of-limitations defenses are waived by defendant or are equitably estopped due to plaintiff's justified reliance on the 2009 Agreement, and due to defendant's ongoing concealment and misrepresentations to HUD, the Lender, and the New Lender ("the Lenders") that defendant had or would be paying the subcontractor claims directly.

Plaintiff states that defendant continues to maintain the Interpleader Action against plaintiff and continues to assert that plaintiff owes Defendant Affiliate $2.1 million for the Claims for Extra Work. Plaintiff asserts that defendant owes plaintiff $3,585,516, which accounts for the value of the BSPRA and approximately $2,120,537.85 for the extra costs plaintiff expended related to the Claims for Extra Work done outside of the Drawings and Specification plans [*Id.* at 17].

### 6. Procedural History

On December 10, 2015, plaintiff filed a Complaint against defendant alleging violations of the False Claims Act ("FCA"), the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and several state law claims [Doc. 1]. Plaintiff updated its complaint in a Second Amended Complaint filed on June 28, 2017 [Doc. 86]. On July 12, 2017, defendant filed a Motion to Dismiss for Failure to State a Claim [Doc. 89]. On March 14, 2018, the Court denied with leave to refile defendant's Motion to Dismiss, stating that defendant should file an answer to plaintiff's Second Amended Complaint before refiling its motion to dismiss or, in the alternative, raise the same arguments in a Rule 56 motion for summary judgment [Doc. 105]. Defendant answered plaintiff's complaint on March 28, 2018 [Doc. 107], and on April 3, 2018, defendant filed a Motion for Judgment on the Pleadings [Doc. 109].

In its Motion for Judgment on the Pleadings, defendant presents several arguments. First, with respect to the FCA claim, defendant states that plaintiff's retaliation claim should be dismissed because the Act is not intended to cover plaintiff or the retaliatory acts that plaintiff is alleging [Doc. 109-1 at 5]. Alternatively, defendant argues that plaintiff's retaliation claim is time-barred by the applicable three-year state of limitations [*Id.* at 8]. Second, with respect to the RICO claim, defendant states that the claim is invalid because plaintiff does not and cannot allege a pattern of racketeering activity, a necessary element of the claim [*Id.* at 13]. Alternatively, defendant states that plaintiff's claim is time-barred by the applicable four-year statute of limitations [*Id.* at 16]. Finally, defendant argues that,

should the Court dismiss the two federal claims, it should decline to exercise supplemental jurisdiction over the remaining state law claims [*Id.* at 17]. However, defendant states that even if the Court chooses to exercise supplemental jurisdiction, the state claims are time-barred by the applicable statutes of limitation [*Id.* at 18].

Plaintiff filed a response in opposition to this motion [Doc. 111] and defendant replied [Doc. 113]. Accordingly, this matter is ripe for disposition.

## II.  Standard of Review

According to Rule 8 of the Federal Rules of Civil Procedure, a plaintiff's complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Though the statement need not contain detailed factual allegations, it must contain "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.*

A defendant may obtain dismissal of a claim that fails to satisfy Rule 8 by filing a motion under Rule 12(c). When considering a Rule 12(c) motion, the Court may look to the complaint, its exhibits, items appearing in the record of the case, and documents incorporated by reference into the complaint and central to the claims. *Paulin v. Kroger Ltd. Partnership I*, 3:14CV-669-DJH, 2015 WL 1298583, at *3 (W.D. Ky. Mar. 23, 2015) (quoting *Barany-Snyder v. Weiner*, 539 F.3d 327, 332 (6th Cir. 2008)). A Rule 12(c) motion for judgment on the pleadings is analyzed using the same standards that apply to

12(b)(6) motions for failure to state a claim. *Lindsay v. Yates*, 498 F.3d 434, 438 (6th Cir. 2007). Thus, on a Rule 12(c) motion, the Court considers not whether the plaintiff will ultimately prevail, but whether the facts permit the court to infer "more than the mere possibility of misconduct." *Iqbal*, 556 U.S. at 679. For purposes of this determination, "all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment." *Tucker v. Middleburg-Legacy Place*, 539 F.3d 545, 549 (6th Cir. 2008) (quoting *JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 581 (6th Cir. 2007)). This assumption of veracity, however, does not extend to bare assertions of legal conclusions, *Iqbal*, 556 U.S. at 679, nor is the Court "bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

After sorting the factual allegations from the legal conclusions, the Court considers whether the factual allegations, if true, would support a claim entitling the plaintiff to relief. *Thurman v. Pfizer, Inc.*, 484 F.3d 855, 859 (6th Cir. 2007). This factual matter must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Plausibility "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged— but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)). "A motion brought pursuant to Rule 12(c) is appropriately granted

'when no material issue of fact exists and the party making the motion is entitled to judgment as a matter of law.'" *Tucker*, 539 F.3d at 549.

## III. Analysis

### A. Plaintiff's Claim of Retaliation under the False Claims Act

Plaintiff has stated a claim under the FCA. Section 3730(h)(1) of the FCA states:

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

31 U.S.C. § 3730(h) (2006).

Defendant argues that plaintiff's FCA claim fails for three reasons. The first two are related: defendant argues that plaintiff is not a cognizable entity under the FCA because plaintiff is not an "employee, contractor, or agent" as contemplated in the Act and, accordingly, also was not "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against *in the terms and conditions of employment*." 31 U.S.C. § 3730(h) (2006) (emphasis added). Defendant also argues that plaintiff's retaliation claim is time-barred [Docs. 109-1, 111]. For the reasons that follow, defendant's positions are unavailing.

As an initial matter, the FCA applies to plaintiff. Plaintiff has pled facts sufficient to demonstrate that it is a contractor as contemplated in the Act. The plain language of the statute makes clear that section 3730(h) remedies are available to employees, contractors,

and agents. Giving the term "contractor" its plain meaning, plaintiff has clearly alleged facts sufficient to show that it was one. *See Potts v. Ctr. for Excellence in Higher Educ., Inc.*, 244 F.Supp. 3d 1138, 1144 (D. Colo. 2017) (finding the relevant definition of 'contractor' in section 3730(h) as 'one who contracts to do work for or supply goods to another') (quoting *Contractor*, *Black's Law Dictionary* (10th ed. 2014)). Plaintiff was the general contractor for the Project, as memorialized in the parties' Construction Contract [Doc. 86-1]. Plaintiff contracted with defendant to oversee construction of the Project in exchange for monetary and proprietary compensation. Therefore, plaintiff is considered a contractor and has alleged facts sufficient to show a contractual relationship with defendant as contemplated in section 3730(h).

Further, case law supports the holding that section 3730(h) means what is says: that relief is available to those who retain an employment, contractual, or agency relationship. *See U.S. ex rel. Abou-Hussein v. Science Applications Intern. Corp.*, Civil Action No. 2:09-1858-RMG, 2012 WL 6892716, at *1 (D.S.C. May 3, 2012), *aff'd* 475 Fed. Appx. 851 (4th Cir. 2012) (per curium) ("Plaintiff does not allege in the Amended Complaint that he had any personal employment, contractual or agency relationship with [defendants]. These Defendants were simply government contractors who were alleged in the Amended Complaint to have acted through Plaintiff's employer [] to retaliate against him. These Defendants fall well outside the scope of the 2009 amendment to § 3730(h)."); *Knight v. Johnson*, Civil Action No. 2:15-cv-03199-DCN-MGB, 2018 WL 3615224, at *11 (D.S.C. May 9, 2018) ("Plaintiff had no sort of employment, contractual, or agency relationship

with [defendants]; accordingly, Plaintiff's claim against Defendants pursuant to 31 U.S.C. § 3730(h) fails.").

Defendant argues that, according to the legislative history, Congress intended the terms "contractor" and "agent," which were added to the statute later than the term "employee," to cover only those individuals and entities that nevertheless operate under something akin to a traditional employment relationship [Doc. 11 p. 8]. But the Sixth Circuit has repeatedly submitted that where, as here, the plain language of a statute is clear, there is no need to consult the legislative history. *Daniel v. Cantrell*, 375 F.3d 377, 383 (6th Cir. 2004) ("Where the plain language of a statute is clear, however, we do not consult the legislative history." (citing *In re Comshare Inc. Sec. Litig.*, 183 F.3d 542, 549 (6th Cir. 1999) ("When interpreting a statute, we must begin with its plain language, and may resort to a review of congressional intent or legislative history only when the language of the statute is not clear.")).

Plaintiff has also alleged sufficient facts to demonstrate that it was "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment" due to its lawful actions. 31 U.S.C. § 3730(h) (2006). Plaintiff contracted with defendant to serve as general contractor for the Project. Plaintiff therefore contracted to provide services and do work for defendant in exchange for compensation. These provisions—in a contract between plaintiff, a general contractor, and defendant—fall within the phrase "terms and conditions of employment" as understood in the FCA. The structure and history of 31 U.S.C. § 3730(h) require this conclusion. The

statute provides a remedy for "employees, contractors, or agents" who are discriminated against "in the terms and conditions of employment." 31 U.S.C. § 3730(h) (2006). These terms appear to contradict one another: contractors and agents normally do not have "terms of employment," as those terms are used in legal parlance. One of the terms therefore must yield.

But the parties disagree about which term that should be. Defendant interprets the language "terms and conditions of employment" as requiring parties to maintain a conventional 'employment-like relationship,' in order to seek relief under section 3730(h) [Doc. 109-1 p. 6]. Defendant thus seems to understand this term as extending only to conventional employer-employee relationships, and reads the Act as amended to cover contractors and agents who, although called such, nevertheless operate under a traditional, common law-type employment relationship. Defendant asserts that there was no employment relationship of this kind between plaintiff and defendant, and so no discrimination with respect to any terms and conditions of their contract is applicable to the claim [Doc. 113 p. 5]. Plaintiff argues to the contrary, stating that the Act's scope was expanded more substantially to cover contractors and agents more generally, and that the terms and conditions of its employment by defendant are laid out in the Construction Contract and 2009 Agreement. Plaintiff further asserts that these terms were violated when defendant retaliatorily withheld plaintiff's compensation and equity when plaintiff refused to condone or cooperate in defendant's alleged fraudulent misrepresentations to HUD [Doc. 111 p. 8].

Plaintiff has the better of the argument. First, relevant rules of statutory construction dictate that later-in-time amendments of statutory provisions govern. *Detroit Receiving Hosp. and Univ. Health Ctr. v. Sebelius*, 575 F.3d 609, 615 (6th Cir. 2009). The terms "contractor" and "agent" were added to the FCA in 2009, expanding the scope of cognizable plaintiffs beyond the original "employee." Therefore, the focus must be on the relevant agreement which houses the terms and conditions of a cognizable party's—be it an employee, contractor, or agent— employment. If the phrase "in the terms and conditions of employment" means what defendant says—that the FCA, despite clearly applying to contractors and agents, also requires a common law understanding of an employment-like relationship, the Act would be limited in ways that fail to comport with the plain meaning of its terms and would need to be construed contrary to relevant rules of statutory construction. It is difficult to see why Congress would have written the Amendments to provide such a nonsensical result.

Other courts have also found that employment-like relationships now cover agent and contractor work arrangements more generally. For example, the Fifth Circuit, has stated:

> The 2009 amendment requires that courts must expand the class of defendants beyond just employers but not interpret that expansion as a license to sue anyone…. One of the district courts recognized there still must be an employer-type relationship, an articulation we can accept if the meaning is confined to the three types of relationships listed in the statute. Defendants, then, must be those by whom plaintiffs are employed, with whom they contract, or for whom they are agents. In addition, the retaliatory action must be related to terms and conditions of employment, or the contract, or agency relationship.

*U.S. ex rel. Bias v. Tangipahoa Parish Sch. Bd.*, 816 F.3d 315, 324 (5th Cir. 2016) (internal quotation marks and citations omitted).

Contrary to defendant's arguments, Sixth Circuit precedent does not require a different result. Defendant reads *Vander Boegh v. EnergySolutions, Inc.*, 772 F.3d 1056, 1062–63 (6th Cir. 2014), to state that section 3730(h), as expanded by its 2009 amendment, is only meant to correct a narrow loophole and thus extend protection to those workers who are considered employees in everything but name [Doc. 113 p. 3]. However, the Court disagrees with defendant's reading of *Vander Boegh* and finds, as discussed above, that the statute's 2009 amendments widened coverage for FCA retaliation beyond what defendant submits.

In *Vander Boegh*, the Sixth Circuit discussed in dicta the court system's evolving understanding of the term "employee" as used in the FCA. There, the circuit court found that a job applicant, who had never been an employee, contractor, or agent of the defendant, fell outside of section 3730's scope of protection. *Vander Boegh*, 772 F.3d at 1062. The applicant argued that the term "employee" should be broadly construed to encompass job applicants, however the court declined to adopt this expansive reading, and instead discussed the effect of the 2009 FCA amendments to reason that the term 'employee' should be limited to 'employment-like relationships' "regardless of whether the person is a salaried employee, an employee hired as an independent contractor, or an employee hired in an agency relationship." *Id.* at 1063–64 (citing 155 Cong. Rec. E1295–03, 2009 WL 1544226 (June 3, 2009) (statement of Rep. Howard L. Berman)).

*Vander Boegh* is distinguishable from the current case, where plaintiff seeks section 3730 protection based on its position as a contractor to defendant, not an employee of defendant. There is no binding precedent in the Sixth Circuit as to the scope of a contractor's FCA protections; however other courts in our circuit have found that the addition of the terms "contractor" and "agent" to section 3730 has expanded FCA protections beyond those traditionally understood to be "employees." The district court in *Ickles v. Nexcare Health Sys., L.L.C.*, 178 F.Supp. 3d 578, 591 (E.D. Mich. 2016) explained:

> The 2009 Amendments to section 3730(h) added 'contractors' and 'agents' to the description of persons within the scope of the Act's protections. Although the amendments did not define those terms, it is clear that the purpose was to ensure that the protections of the Act extended beyond a traditional employment relationship.

*Id.* (quoting "The False Claims Act: Fraud Against the Government § 5:1).

In *Ickles*, plaintiff was an employee of a non-party entity, which hired plaintiff as a physical therapist and then assigned her to provide work services to defendant, a nursing home. The court found that plaintiff was a contractor to defendant under section 3730 because she had been contracted out by her home company to provide services for defendant. *Ickles*, 178 F.Supp. 3d at 591. The court explained "in addition to an employee's actual employer, the current version of the statute also covers independent contractors and other employment-like relationships." *Id.* at 591 (quoting *Tibor v. Mich. Orthopaedic Inst.*, 72 F.Supp. 3d 750, 759 (E.D. Mich. 2014) (internal quotations and emphases omitted)). The court thus found that the FCA could apply to an employment-

like relationship outside of the scope of a traditional, common law understanding of the term.

In the present case, the Court determines that plaintiff is a contractor whose "terms and conditions of employment" with defendant were memorialized in the 2007 Construction Contract and, plaintiff alleges, updated in the 2009 Agreement [Doc. 86; Doc 86 Exhibit 1]. Plaintiff is therefore properly before the Court pursuant to section 3730(h) and furthermore has sufficiently pled facts which, if true, would show retaliatory actions taken by defendant that are related to the terms and conditions of the parties' contractual relationship.

The Court reaches this conclusion acknowledging the FCA's role as a remedial statute designed to stymie fraud against the government. *U.S., ex rel., Rigsby v. State Farm Fire & Cas. Co.*, 794 F.3d 457, 468 (5th Cir. 2015) (citing *Townsend v. Bayer Corp.*, 774 F.3d 446, 459 (8th Cir. 2014)). The Act makes liable any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" against the Government. 31 U.S.C. § 3729(a)(1)(A) (2006). The FCA should thus be construed broadly as it is "intended to reach all types of fraud, without qualification, that might result in financial loss to the Government." *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968). In 2009 the government amended the Act, compelled by what it considered to be an unduly restrictive readings by the courts of Section 3730(h)'s term "employee." *See* S. REP. 110-507, 2008 WL 4415147, at *6, 26 ("The need for a robust FCA cannot be understated . . . .While this provision was designed to protect employees from employer

retaliation, over the past 20 years courts have limited this protection through various decisions narrowly interpreting the definition of 'employee' and thus leaving contractors and subcontractors open to retaliation."); *see also* 155 Cong. Rec. E1295-03, 2009 WL 1544226, at *E1297, E1300 ("Since its inception, the central purpose of the False Claims Act has been to enlist private citizens in combating fraud against the U.S. Treasury . . . .To address the need to protect persons who seek to stop violations of the Act regardless of whether the person is a salaried employee, an employee hired as an independent contractor, or an employee hired in an agency relationship, Section 4(d) of S. 386 amends Section 3730(h) so that is expressly protects not just 'employees' but also 'contractors' and 'agents'.") The broad purpose of the Act, combined with the legislative history of its 2009 amendment, makes clear that preventing fraud against the government remains the overriding purpose of the FCA and that section 3730(h) should be read to protect those parties, now including contractors and agents, whose conditions of employment are effected by their lawful acts to uncover such fraud.

Finally, plaintiff's retaliation claim is not time-barred. Defendant argues that the FCA's applicable three-year statute of limitations has run because any alleged retaliation must have occurred by the time the contract terms were completed in 2009 in order to be cognizable under the statute [Doc. 109-1 p. 9].   Defendant states that under the Construction Contract any money owed to plaintiff would necessarily have been due and payable in 2009 when the Project closed [Doc. 86-1].   Defendant argues that because plaintiff failed to commence this suit by 2012 this claim must fail.  Defendant also states

that any claims for alleged retaliation occurring after 2012 are not cognizable under section 3730(h) because they do not arise from acts of discrimination 'in the terms and conditions of employment" [Doc. 109-1 p. 11].

The Court disagrees with defendant, and instead holds that section 3730(h) applies to retaliatory actions defendant allegedly took against plaintiff after its role as general contractor ended that involve "the terms and conditions of [its] employment."  Section 3730(h) of the FCA states "a civil action under this subsection may not be brought more than 3 years after the date when the retaliation occurred."  31 U.S.C. § 3730(h)(3) (2006). Courts vary in opinion on whether, for a claim to be cognizable, that retaliation must occur before an employment, contractual, or agency relationship has ended, or whether any exceptions should exist to an otherwise bright line rule.  The Court notes as an initial matter that the plain language of section 3730 does not contain any temporal restrictions on when alleged retaliation must occur to be cognizable.  However, as explained below, the Court concludes its holding is compatible with relevant caselaw.

Defendant relies on *U.S. ex rel. Head v. Kane Co.*, 798 F.Supp. 2d 186, 208 (D.D.C. 2011) to argue that "claims for retaliatory action occurring solely after a plaintiff has been terminated from his job" are not cognizable under section 3730.  However, the district court in *Head* went on to hold "that Section 3730(h) does not apply to retaliatory actions [defendant] allegedly took against Relator after his employment with the Company ended *and which did not involve 'the terms and conditions of [his] employment*."  *Id.* (emphasis added).  The relator in *Head* alleged retaliatory action from his former employer in the

form of a counterclaim against the relator, defamatory and disparaging remarks made about the relator, and an alleged impersonation of Relator and the posting of Relator's phone number on a website. *Id.* As the court points out, all of these actions occurred after the relator's employment was terminated and none of the actions concerned the terms and conditions of his employment. In contrast, plaintiff in this case alleges that defendant seeks to divest plaintiff of its ownership interest in defendant and that defendant refuses to pay agreed upon fees relating to plaintiff's services as the general contractor [Doc. 86 p. 18]. The retaliatory actions alleged by plaintiff then, relate directly to the terms and conditions of compensation owed to plaintiff under the Construction Contract. Although these alleged actions took place between 2013 and 2015, well after the 2009 completion of the Project construction, they do involve the terms and conditions of employment and therefore are cognizable under section 3730(h).

This ruling also comports with the holding in *Fitzsimmons v. Cardiology Assocs. of Fredericksburg, Ltd.*, No. 3:15CV72, 2015 WL 4937461 (E.D. Va. Aug. 18, 2015), a case both parties cite to support their positions. In *Fitzsimmons*, plaintiff was a cardiologist who entered into an employment agreement with defendant under terms which made plaintiff both an employee of and a shareholder in the defendant. *Fitzsimmons*, 2015 WL 4937461, at *2. Plaintiff alleged that defendant engaged in discriminatory actions cognizable under section 3730(h) when it improperly withheld payments due to plaintiff under the termination provision of his employment agreement. *Id.* at *7. This alleged retaliation occurred after plaintiff left defendant's employ, and plaintiff sought to allege FCA

protection for post-termination retaliation. Although the court acknowledged that the majority of courts have found that section 3730(h) does not provide a remedy for post-termination retaliation, it noted that no court had been confronted with the issue of improper reimbursement for money owed, post-termination, under terms and conditions of an employment contract. *Id.* The court held that plaintiff alleged facts sufficient to survive a motion for judgment on the pleadings, stating "the Employment Agreement makes plain that this compensation would not occur while [plaintiff] was an employee." *Id.* The court found that any temporal limitation to the alleged retaliatory acts did not defeat claims made for payment as outlined in the terms and conditions of an employment agreement. *Id.*

Like *Fitzsimmons*, plaintiff here is bringing a claim for retaliatory action under section 3730(h) for discriminatory acts which occurred after the relevant employment relationship ended, but which relate to post-termination compensation as laid out in the Construction Contract. The Construction Contract states in relevant part:

> The balance due the [plaintiff] hereunder shall be payable upon the expiration of 30 days after the work hereunder is fully completed… With its final application for payment by [defendant], [plaintiff] shall disclose, on a form prescribed by the Commissioner, all unpaid obligations contracted in connection with the work performed under this Contract. [Plaintiff] agrees that within 15 days following receipt of final payment, it will pay such obligations in cash and furnish satisfactory evidence of such payment to [defendant].

[Doc. 86-2].

The Construction Contract therefore envisions that final payment will occur after work under the Contract has been completed. Plaintiff alleges that this Contract was

amended in February 2009 when defendant promised plaintiff that it would pay the outstanding Claims of Extra Work directly, as opposed to giving the money to plaintiff to distribute accordingly [Doc. 86 ¶ 21]. Plaintiff states that it relied on this representation, which was memorialized in representations defendant made to HUD and Lender in writing that same month [*Id.*]. Similar to *Fitzsimmons*, the Court will not, at this early stage of pleading, find that section 3730(h)'s protections categorically cannot extend to claims for post-termination payments that are set forth in the terms and conditions of plaintiff's employment contract or any document that memorializes amendments to the contract. Plaintiff's 3730(h) retaliation claim alleges discriminatory actions relating to the terms and conditions of its employment as general contractor. Plaintiff alleges that the Construction Contract was updated to reflect payment for services performed which would take place after the Project ended. Plaintiff further alleges that defendant reneged on its obligations under this updated Contract and moreover discriminated against plaintiff based on the terms and conditions set forth and agreed upon by the parties when plaintiff refused to condone or cooperate with defendant's allegedly fraudulent statements to HUD.

Plaintiff has pled sufficient facts to plausibly meet each element of a § 3730(h) claim. In order to state a claim for relief from retaliatory discharge under section 3730(h) a plaintiff must show: (1) it was engaged in a protected activity; (2) its employer knew that it was engaged in the protected activity; and (3) the employer discharged or otherwise discriminated against it as a result of the protected activity. *Yahasz v. Brush Wellman, Inc.*,

341 F.3d 559, 566 (6th Cir. 2003) (citing *McKenzie v. BellSouth Telecomm., Inc.*, 219 F.3d 508, 513–14 (6th Cir. 2000) (*"McKenzie II"*)). Plaintiff adequately alleged it engaged in protected activity when it refused to cooperate or provide consent to the 2012 refinancing of the Project based on defendant's alleged false statements to HUD. Plaintiff has also adequately pled that defendant knew of plaintiff's protected activities by alleging that it advised defendant's agents and attorneys that it would not provide consent to the 2012 refinancing because it believed the financing was being obtained under false pretenses that were fraudulent and wrongful [Doc. 86 ¶41]. Finally, plaintiff sufficiently alleges discrimination as a result of its protected activities. Specifically, plaintiff alleges that as a result of its protected activities defendant sought to divest plaintiff of its ownership interest in defendant and improperly reimbursed plaintiff for money owed under the Construction Contract [Doc. 86 p. 18]. Accordingly, the Court will not currently dismiss plaintiff's Count One and determines that summary judgment would be a more suitable stage to determine the extent that the FCA contemplates recovery for plaintiff's post-termination retaliation. Defendant's Motion to Dismiss Count One is **DENIED**.

## B. Plaintiff's RICO Claim

Count Eight of plaintiff's Complaint accuses defendant of violating 18 U.S.C. § 1962(c), the federal RICO statute. A violation of 18 U.S.C. § 1962(c) requires (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985). Defendant seeks to dismiss this claim by

arguing that element three, establishing a pattern, has not been met. In addition, defendant argues that plaintiff failed to file this action within the requisite four-year statute of limitations period, and it is therefore time-barred [*Id.*]. The Court will address each of these arguments in turn.

### 1. Pattern

Defendant argues in its Motion to Dismiss that plaintiff's allegations of racketeering activity do not constitute a "pattern" as required by the RICO statute. Specifically, defendant argues that plaintiff has failed to plead a continuous pattern of criminal activity and has only plead a single scheme with a single victim. [Doc. 109-1 p. 14].

RICO provides that a 'pattern of racketeering activity' "requires at least two acts of racketeering activity, one of which occurred after [October 15, 1970] and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5) (2010). In assessing whether plaintiff has adequately pled a "pattern" of racketeering activity, the Sixth Circuit has indicated that courts should not focus on "counting the number of predicate acts alleged by . . . plaintiff." *Brown v. Cassens Transp. Co.*, 546 F.3d 347, 353 (6th Cir. 2008). Rather, they should determine whether plaintiff has established two required elements: "that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." *Id.* at 354 (quoting *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989)).

A relationship is shown, and thus the first element is satisfied, when the predicate acts "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* To satisfy the second element, a plaintiff must show "continuity," which can be satisfied either by showing either a "closed period [of time] of repeated conduct" ("closed-ended continuity"), or past conduct that by its nature projects into the future with a threat of repetition" ("open-ended continuity"). *Id.* Plaintiff must therefore plead with sufficient particularity at least two predicate acts as required by the RICO statute and also satisfy *H.J. Inc.*'s relationship-plus-continuity-standard. The Court concludes that it has.

First, plaintiff pled with sufficient particularity at least six instances between January 2009 and January 2015 wherein defendant allegedly performed hundreds of predicate criminal acts of mail and wire fraud, money laundering, making of false statements to HUD, and asserting false claims.[1] Therefore, plaintiff has met the minimum two-predicate-acts and time requirements of 18 U.S.C. § 1961(5). Second, the predicate

---

[1]     The Court finds that these pleadings also meet Fed. R. Civ. P. 9(b)'s special pleading standard which states "in alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Under this standard, plaintiffs must allege times, places, contents, and victims of the underlying fraud with specificity. *Vild v. Visconsi*, 956 F.2d 560, 567 (6th Cir. 1992). Here, plaintiff pleads specific false statements, time periods, and victims in making its RICO claim. Specifically, the Second Amended Complaint alleges predicate acts of mail and wire fraud during the periods of February 2008, February 2009, and late 2012, in which defendant made fraudulent representations to HUD and its Lenders, fraudulently caused Defendant Affiliate to purchase the assignments of the subcontractors Claims For Extra Work, and fraudulently made false claims based on those Claims for Extra Work [Doc. 86].

28

acts pled by plaintiff are related and were all allegedly performed for defrauding plaintiff and other entities. Thus, the alleged predicates are not "isolated events," but rather "share the same purpose, results, and victims." *See id.*

The Court disagrees with defendant's assertion that plaintiff was the single victim and that defrauding plaintiff was the single scheme. Plaintiff's complaint alleges several victims, including itself, HUD, both Lenders, the title insurer, the bond surety, and various indemnitors on the bond. Further, it does not matter for purposes of victim identification that these other entities are not party to this suit. *See Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1265 (D.C. Cir. 1995) ("We see no basis for defendants' suggestion that a non-plaintiff cannot be a victim [when stating a RICO claim]."). Additionally, the alleged predicate acts have the same purpose, which was to allow defendant to falsify the status of the Claims for Extra Work. Finally, the alleged predicate acts have the same result, which was to divert payment of funds that rightfully belonged to others to defendant and Defendant Affiliate. Therefore, the first element is satisfied because plaintiff has adequately alleged that the predicate acts were related.

In addition, the complaint adequately pleads the second element by establishing closed-ended continuity. Closed-ended continuity can be established "by proving a series of related predicates extending over a substantial period of time." *Id.* However,

racketeering activity "extending over a few weeks or months and threatening no future criminal conduct [does] not satisfy this requirement." *H.J. Inc.*, 492 U.S. at 242.[2]

The case of *Brown v. Cassens Transport Co.*, 546 F.3d 347 (6th Cir. 2008) is instructive as to what constitutes closed-ended continuity. In that case, the Sixth Circuit held that at least thirteen predicate acts of mail and wire fraud, spanning a period of well over three years, was sufficient to establish closed-ended continuity. *Id.* at 355. Similarly, in this case plaintiff has pled related predicate acts which span over at least three years, from August 2009 to late 2012, and which include numerous acts of mail and wire fraud as well as false claims in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 1343. The Court thus finds that plaintiff has successfully pled close-ended continuity.

---

[2]     Defendant reads *H.J. Inc. v Northwestern Bell Telephone Co.*, 492 U.S. 229, 239 (1989) to state that regardless of pleading closed- or open-ended continuity a plaintiff must show that the criminal activity is continuing or will continue [Doc. 113 p. 9]. Defendant argues that under either theory a claim must fail if plaintiffs do not establish that the racketeering activity is ongoing or could occur in the future. However, the Court concludes that defendant misinterprets the word "continued" so as to render close-ended continuity redundant at best or oxymoronic at worst. As the court explained in *J.H.*, the concept of continuity as used in the phrase "continued criminal activity" can refer to "either a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* at 241. Therefore, a plaintiff must show that the predicate acts continued for a substantial period of time (close-ended continuity), or, if not enough time has passed, that the acts continue to occur or there is a threat of future illegal activity (open-ended continuity). *See, H.J. Inc.*, 492 U.S. at 242 ("Congress was concerned in RICO with long-term criminal conduct. Often a RICO action will be brought before continuity can be established in [a close-ended] way. In such cases, liability depends on whether the threat of continuity is demonstrated."). In essence, the difference between these terms is timing, dependent on whether predicate acts have continued for a sufficient period of time so as to bring a close-ended claim or whether the predicate acts do not fully demonstrate a RICO violation and so continuing or future acts must be plead to fully develop the claim. Therefore, the Court finds that plaintiff can successfully bring a RICO complaint without showing that the criminal activity is currently underway or will continue in the future.

### 2. Statute of Limitations

Finally, Defendant submits that plaintiff's claim is time-barred by the applicable four-year statute of limitations [Doc. 109-1 p. 16] but deciding this matter would be premature. The clock begins to run on asserting a RICO claim when the plaintiff knew, or through the exercise of reasonable diligence should have discovered, that it was injured by a RICO violation. *Rotella v. Wood*, 528 U.S. 549, 553–54 (2000). Determining the applicable statute of limitations period is a question of fact under statutes that have adopted the discovery rule. *See Pearson v. Specialized Loan Servicing, LLC*, No: 1:16-cv-318, 2017 WL 3158791, at *6 (E.D. Tenn. July 24, 2017) ("Whether a plaintiff exercised reasonable diligence and care in discovering that he has a cause of action is a question of fact.") (citing *Gerdau Ameristeel, Inc. v. Ratliff*, 368 S.W.3d 503, 509 (Tenn. 2012)). The Court cannot consider this question of fact on a Rule 12(c) motion, *id.,* as plaintiff and defendant disagree about when plaintiff did or should have discovered its RICO cause of action against defendant and thus when plaintiff's injury occurred. Defendant's Motion as to Count Eight is **DENIED**.

### C. Plaintiff's State Law Claims

Plaintiff has also alleged several state-law claims. These too will not be dismissed.

### 1. Plaintiff's Contract-Related Claims

Defendant argues that plaintiff's breach-of-contract claims are time-barred, but those claims will not be dismissed on that ground. Both parties agree that plaintiff's contract-related claims are governed by Tenn. Code Ann. § 28-3-109(a)(3), which instructs

"actions on contracts not otherwise expressly provided for" must be commenced within six years after the cause of action accrues. Further, both parties acknowledge that a cause of action for breach of contract accrues on the date of breach. *Green v. THGC, Inc.*, 915 S.W.2d 809, 810 (Tenn. Ct. App. 1995). The parties disagree, however, about when that breach occurred: according to defendant, any breach would have occurred in August 2009, per the terms for final payment in the Construction Contract, however plaintiff maintains that the breach occurred in January 2014, when defendant repudiated its representations and promises to pay the Claims for Extra Work as outlined in the 2009 Agreement [Doc. 109-1 p. 18; Doc. 111 p. 19].

This fact dispute precludes dismissal at this stage of the litigation. Statute-of-limitations defenses are most properly raised in Rule 56 motions, rather than Rule 12(b)(6) or Rule 12(c) motions, because "[a] plaintiff generally need not plead the lack of affirmative defenses to state a valid claim." *Paulin v. Kroger Ltd. P'ship I*, No. 3:14-cv-669, 2015 WL 1298583, at *4 (W.D. Ky. Mar. 23, 2015) (quoting *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012)). Moreover, the parties argue disputed facts in this case, including whether final payment to Plaintiff under the Contract was due in August 2009 or upon completion of the loop road in August 2011. The answers to these questions have bearing on when defendant's alleged breach of contract would have occurred. The Court therefore **DENIES** defendant's motion to dismiss Counts Two and Five.

## 2. Plaintiff's *Quantum Meruit* and Unjust Enrichment Claims

Defendant argues that Counts Three and Four of plaintiff's claim should be dismissed because a party cannot plead claims for express and implied contracts as alternatives under Tennessee law [Doc. 109-1 p. 24]. This position is unavailing. The Court has previously held that plaintiffs may plead, in the alternative, express and implied theories of contract. In *U.S. ex rel. Mesa Associates, Inc. v. PAS-COY, LLC*, No. 3:12-CV-568, 2013 WL 3834038, at *3 (E.D. Tenn. July 23, 2013) the Court explained:

> Upon review of the complaint and claims at issue, as well as the relevant law, the Court finds that it would be premature to dismiss plaintiff's *quantum meruit claim* at this point. As the Sixth Circuit determined in [*Son v. Coal Equity, Inc.*, 122 F. App'x 797 (6th Cir. 2004)], while [defendant] has admitted in its answer that a valid contract exists, such that [defendant] would likely be judicially estopped from later arguing that there is no contractual relationship, "[t]he course of litigation ... is never certain, and there is no guarantee that [defendant] might not attempt to repudiate the concession [later in the suit]." 122 F. App'x at 802. Moreover, Rule 8(d) of the Federal Rules of Civil Procedure allows a party to "state as many separate claims or defenses as it has, regardless of consistency[,]" and to "set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones." Fed. R. Civ. P. 8(d)(2), (3).

> Accordingly, while plaintiff may not obtain double recovery for the same violation, and thus would likely be entitled to recover only on either the breach of contract claim or the quantum meruit theory, allowing both claims to proceed at this point adequately protects plaintiff's rights. See *Son*, 122 F. App'x at 802.

Here, neither party questions the validity of the original Construction Contract. However, the Court reaffirms its reasoning to find that, at this point in the litigation, plaintiff can plead express and implied contract claims as alternatives. Defendant's Motion as to Claims Three and Four is therefore **DENIED**.

### 3.        Plaintiff's Claim for a Constructive Trust

Defendant argues that plaintiff improperly alleges a claim for a constructive trust to avoid the strict requirements set forth for a Mechanics' and Materialmen's Lien as outlined in Tenn. Code Ann. §§ 66-11-101 et seq. [Doc. 109-1 p. 25]. Defendant argues that this claim should be dismissed because T.C.A. § 66-11-106's statute-of-limitation period has run. This argument is baseless. Plaintiff has not pled under T.C.A. § 66-11-101, and therefore any statute-of limitations-arguments based on that statute are inapposite.[3] Moreover, plaintiff's claim is not subject to dismissal for its not being brought under T.C.A. § 66-11-101; defendant cites no case law requiring plaintiff to bring its claim under that statute, and the Court has likewise found none.

What plaintiffs do request is a constructive trust to protect its interest in any converted funds fraudulently withheld by defendant. Under Tennessee law, constructive trusts are imposed against those:

> who, by fraud, actual or constructive, by duress or abuse of confidence, by commission of a wrong, or by any form of unconscionable conduct, artifice, concealment, or questionable means, or who has in any way against equity and good conscience, either has obtained or holds the legal right to property which he ought not, in equity and good conscience, hold and enjoy.

*Central Bus Lines v. Hamilton Nat. Bank*, 239 S.W.2d 583, 585 (Tenn. Ct. App. 1951).

Constructive trusts have been found appropriate where:

---

[3]      Even if the Court were to consider defendant's argument under T.C.A. § 66-11-102, as noted earlier in this opinion, it would be better suited for a Rule 56 motion because "[a] plaintiff generally need not plead the lack of affirmative defenses to state a valid claim." *Paulin v. Kroger Ltd. P'ship I*, No. 3:14-cv-669, 2015 WL 1298583, at *4 (W.D. Ky. Mar. 23, 2015) (quoting *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012)).

> (1) a person procures the legal title to property in violation of some duty, express or implied, to the true owner; (2) the title to property is obtained by fraud, duress or other inequitable means; (3) a person makes use of some relation of influence or confidence to obtain the legal title upon more advantageous terms than could otherwise have been obtained; and (4) a person acquires property with notice that another is entitled to its benefits.

*Intersparex Leddin KG v. Al-Haddad*, 852 S.W.2d 245, 249 (Tenn. Ct. App. 1992) (citing

*Gibson's Suits in Chancery* § 383 (7 ed. 1988)).

Plaintiff here has alleged that defendant acted fraudulently and in bad faith by failing to directly pay subcontractors for the Claims for Extra Work per the parties' 2009 Agreement. Plaintiff asserts that this failure and subsequent deceit has revived its original right of payment under the Construction Contract and therefore asks for a constructive trust on the property "to the extent that the Court may find that [defendant] has used funds and/or property of [plaintiff] for the improvement of the Property in connection with Project and thereby converted the personalty of Contractor" [Doc. 86 p. 25].

Plaintiff has stated factual allegations which, if true, would entitle it to the requested relief. The Complaint alleges that the parties updated the Construction Contract to allow defendant to directly pay subcontractors for the Claims for Extra Work relating to the Project. Plaintiff further alleges that defendant and its Affiliate, instead of paying these claims directly and in full, bought assignments of these claims, while continuously misrepresenting to plaintiff, HUD, various Lenders, and others that no unpaid obligations remained for the Project. Plaintiff has therefore pleaded facts showing elements of fraud or concealment relating to the Project, and any improvements made to the Project's property pursuant to this fraud would not be held "in equity and good conscience." *Roach*

*v. Renfro*, 989 S.W.2d 335, 341 (Tenn. Ct. App. 1998). The Court therefore **DENIES** defendant's motion to dismiss Count Six.

### 4. Plaintiff's Claim for *Lis Pendens*

Defendant argues that Count Seven should be dismissed on both procedural and substantive grounds. First, defendant states that plaintiff has failed to meet the statutory requirements for requesting a *lis pendens* under Tenn. Code Ann. § 20-3-101 because plaintiff has failed to include a legal description of the property in its Second Amended Complaint, which plaintiff seeks to have certified and recorded with the Register of Deeds for Knox County in accordance with the statute [Doc. 109-1 p. 23–24]. Defendant also asserts that this lawsuit does not affect title to the underlying property and therefore this claim is inappropriate. *Id.*

In Tennessee a party seeking to fix a lien *lis pendens* on real estate must request a court to issue a lien for the party to file for record in the register's office of the county in which the property is located. Tenn. Code Ann. § 20-3-101. The filed record must contain "the names of the parties to the suit, a description of the real estate affected, its ownership and a brief statement of the nature and amount of the lien sought to be fixed." *Id.* Such a lien "preserves the status quo and protects the interests of the litigants in the specific property which is subject to the lawsuit from further alienation until the court can render its decision." *In re Adams*, 1984 Bankr. LEXIS 6471, at *16 (M.D. Bankr. Tenn., Jan. 11, 1984).

Plaintiff has met the requirements under T.C.A. § 20-3-101 for requesting a lien *lis pendens*. Although defendant alleges that plaintiff's Second Amended Complaint does not include a legal description of the property, per the statute it must only contain "a description of the real estate affected." Tenn. Code Ann. § 20-3-101. Under Tennessee law, a description of real estate is adequate if an instrument's description allows it to be located and distinguished from other property. *Wallace v. McPherson*, 214 S.W.2d 50, 53 (Tenn. 1947) (citing 16 Am. Jur., *Deeds* § 263). In the Second Amended Complaint plaintiff identifies the property as the Legacy Point Apartments, 2901 Legacy Pointe Way, Knoxville, Tennessee [Doc. 86 p. 2]. The Court finds this address adequate for the purposes of being located and distinguished from other property.

Turning to the substantive argument, defendant cites no case law to support its conclusion that plaintiff's claim seeking authority to file a lien *lis pendens* must be dismissed because the lawsuit does not affect title to the underlying property. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to. . . put flesh on its bones." (internal quotations omitted)); *see also* E.D. Tenn. L.R. 7.1(b) (requiring parties to provide the Court with the "legal grounds which justify the ruling sought from the Court").

Even if this argument were more developed, it would likely still fail. T.C.A. § 20-3-101 states that a lien *lis pendens* can be requested for, among other reasons, "tracing a

trust fund . . . or otherwise." T.C.A. § 20-3-101 does not itself impart the authority for asserting a lien, it merely sets for the procedure for establishing one. *In re Adams*, 1984 Bankr. LEXIS 6471, at *15. However, a lien *lis pendens* is appropriate under Tennessee law when the relief sought, equitable or otherwise, involves the plaintiff's rights to a particular piece of property. *Id.* at *16 ("A lien *lis pendens* is only available to protect a claimant who is suing on a cause wherein the specific property secured by the *lis pendens* is a part of the corpus which constituted the subject matter of the suit. The lien *lis pendens* preserves the status quo and protects the interests of the litigants in the specific property which is subject to the lawsuit from further alienation until the court can render its decision.").

Here, plaintiff has claimed an interest in the property at issue by invoking the constructive-trust remedy "to the extent that the Court may find that [defendant] has used funds and/or property of [plaintiff] for the improvement of the Property in connection with the Project and thereby converted the personalty of [plaintiff]… into a portion of the value of the Property" [Doc. 86 p. 25]. Plaintiff thus seeks to establish a lien *lis pendens* to protect its interest in property relating directly to the current lawsuit. This falls within the language and purpose of T.C.A. § 20-3-101. The Court therefore will not dismiss plaintiff's claim for a lien *lis pendens* at this time. Defendant's Motion as to Claim Seven is **DENIED**.

## IV.    Conclusion

For the reasons set forth above, the Court will **DENY** defendant's Motion for Judgement on the Pleadings [Doc. 109].  Plaintiff may proceed with all claims against defendant as detailed in its Second Amended Complaint.

ORDER ACCORDINGLY.

s/ Thomas A. Varlan
CHIEF UNITED STATES DISTRICT JUDGE